UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FAIR HOUSING JUSTICE CENTER, INC.<br><br>   Plaintiff,<br><br><br><br>   v.<br><br>Harbor View Senior Living Residence, LLC; Amber Court of Brooklyn, LLC; Lakehaven Equities, Inc.; Judith Lynn Home for Adults, LLC; Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC; Amber Court @ Suffolk County LLC,<br><br>   Defendants. | ___ Civ. _____ (   )<br><br>**COMPLAINT** |

Plaintiff Fair Housing Justice Center, by their attorneys, Patterson Belknap Webb & Tyler LLP, and Mobilization for Justice, Inc., alleges the following for its Complaint against the Harbor View Senior Living Residence, LLC; Amber Court of Brooklyn, LLC; Lakehaven Equities, Inc.; Judith Lynn Home for Adults, LLC; Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC; and Amber Court @ Suffolk County, LLC (collectively "Defendants"):

## Introduction

1.     Defendants own and operate adult care facilities ("ACFs"), which are government-funded and subsidized programs that exist to provide housing and services to New Yorkers with disabilities.

1

2.      Notwithstanding that these facilities *exist* to serve disabled New Yorkers, Defendants have implemented blanket policies to refuse admission to individuals who use wheelchairs *because* of their wheelchair use.

3.      In 2023, the Fair Housing Justice Center ("FHJC"), which protects New Yorkers from discriminatory housing practices and ensures equal access to housing, uncovered systemic discrimination by Defendants' ACFs and programs.

4.      FHJC testers posed as family members seeking admission for their disabled relatives to Defendants' ACFs and assisted living programs ("ALPs").  Time and again, the "test applicants," *i.e.,* the testers' hypothetical relatives, who used a manual or electric wheelchair were turned away due to their wheelchair use, while those test applicants who could walk (with the help of a walker or otherwise) were not.

5.      Defendants did not conduct an individualized assessment of the test applicants who required a wheelchair to determine their eligibility or qualification for ACF housing and services, nor did they endeavor to provide a reasonable accommodation or engage in a cooperative dialogue about whether such accommodations were feasible.  Indeed, Defendants' ACFs did not allow test applicants to tour the facilities or meet with the staff.  Instead, Defendants' agents told the testers to look elsewhere for their relatives, or failed to follow up after promising they would.

6.      Defendants' blanket discrimination against prospective residents with mobility disabilities based on their need to use wheelchairs (manual or electric) violates the Fair Housing Act ("FHA"), Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act ("ACA").  Defendants' practices fail to treat would-be applicants as

individuals and rely on stereotypes and false assumptions to exclude wheelchair users based on disability.

7.      FHJC brings the instant action to put an end to these discriminatory practices and in furtherance of its mission to ensure that people with disabilities have equal access to housing opportunities in the New York City area.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343 and 2201, 29 U.S.C. § 794(a), and 42 U.S.C. § 3613.

9.      Declaratory relief is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. §§ 2201, 42 U.S.C. § 12133, 42 U.S.C. § 12188(a), and Rule 65 of the Federal Rules of Civil Procedure.

10.      Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(b)(1).  Defendant Judith Lynn Home for Adults, LLC resides within the district and all Defendants reside in New York State.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the events or omissions giving rise to the claims occurred in the Southern District of New York.

## The Parties:  Fair Housing Justice Center

11.      Plaintiff FHJC is a nonprofit organization dedicated to ensuring that all people have equal access to housing opportunities in the greater New York City region by eliminating housing discrimination and creating open, accessible, and inclusive communities.

12.      Among other things, the FHJC:  (a) provides information to the public and other nonprofit organizations in the New York City regional area about fair housing laws; (b) provides intake counseling to individuals and organizations who are potentially facing housing

3

discrimination; (c) conducts testing and other investigations of allegations of housing discrimination; (d) makes legal referrals to cooperating attorneys; (e) assists with the preparation and filing of administrative housing discrimination complaints; and (f) provides post-referral litigation support services.  The FHJC provides these services free of charge and without regard to income.

13.     The FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing enforcement activities, and engages in policy initiatives that further the FHJC's mission, including the publication and dissemination of reports and educational materials.

14.     Among other things, the FHJC employs individuals as "testers."  At the FHJC's instruction, the testers pose as renters or homebuyers to obtain information about the conduct of local governments, landlords, real estate companies, agents, and others to ensure that no illegal housing discrimination is taking place.

15.     As set forth in greater detail below, the FHJC expended staff time and other resources to investigate and respond to Defendants' discriminatory practices, which diverted resources away from other FHJC activities and the community it serves.

16.     Defendants' discriminatory practices frustrate the FHJC's mission to ensure that all people have equal access to housing opportunities in the greater New York City region by, among other things, making housing unavailable because of disability.

### The Parties:  The Adult Care Facility Defendants

17.     Defendant Harbor View Senior Living Residence, LLC operates Harbor View Home for Adults, an ACF located at 3900 Shore Parkway, Brooklyn, NY 11235.  Harbor View

Home for Adults (also "Amber Court of Harbor View") is licensed as an adult home to house up to 162 residents.

18.     Defendant Amber Court of Brooklyn, LLC operates Amber Court of Brooklyn, an ACF located at 650 East 104th Street, Brooklyn, NY 11236.  Amber Court of Brooklyn is licensed as an adult home to house up to 224 residents, including 125 residents in its ALP.

19.     Amber Court of Westbury, LLC operates Amber Court of Westbury, an ACF located at 3400 Brush Hollow Road, Westbury, NY 11590.  Amber Court of Westbury is licensed as an adult home to house up to 225 residents, including 189 residents in its ALP.

20.     Amber Court of Westbury II, LLC operates Amber Court of Westbury, licensed as an adult home and Assisted Living Residence (ALR) to house up to 64 residents, including 32 residents in its Enhanced Assisted Living Residence (EALR) and 32 residents in its Special Needs Enhanced Assisted Living Residence (SNALR).  This program is registered and licensed separately but operates at the same location as that of Amber Court of Westbury, LLC.  Upon information and belief, this program is the part of the facilities located at Brush Hollow Road that are referred to as "The Alcove," with a separate dining hall for residents with additional care needs.

21.     Defendant Amber Court @ Suffolk County LLC operates Amber Court of Smithtown, an ACF located at 130-132 Lake Avenue, Nesconset, NY 11767.  Amber Court of Smithtown is licensed as an adult home to house up to 186 residents, including 168 residents in its ALP.

22.     Defendant Lakehaven Equities, Inc. operates The Lake Shore Assisted Living Residence, an ACF located at 211 Lake Shore Road, Lake Ronkonkoma, NY 11779.  The Lake

Shore Assisted Living Residence is licensed as an adult home to house up to 200 residents, including 200 residents in its ALR.

23. Defendant Judith Lynn Home for Adults, LLC is the operator of Amber Court of Pelham Gardens, an ACF located at 1800 Waring Avenue, Bronx, NY 10469. Amber Court of Pelham Gardens is licensed as an adult home to house up to 200 residents, including 178 residents in its ALP.

24. Defendants Amber Court of Brooklyn, LLC,  Amber Court of Westbury, LLC, Amber Court of Westbury II, LLC, Amber Court @ Suffolk County LLC, and Judith Lynn Home for Adults, LLC (collectively, the "Federally-Funded Defendants") receive federal funding through Medicaid to operate their programs and activities.

25. Upon information and believe, Defendants are paid monthly facility fees through a combination of private payments, residents' federal Social Security benefits, and/or accompanying state supplemental payments.

### Adult Care Facilities

26. By New York State statute, ACFs were established to provide housing and services to people who are "by reason of physical or other limitations associated with age, physical or mental disabilities or other factors, unable or substantially unable to live independently." N.Y. Soc. Serv. Law § 2(21).  They exist to serve New York residents with disabilities, including those with mobility disabilities, mental illness, and complex medical conditions.

27. ACFs enter into agreements with their residents setting out the services to be provided and the resident's monthly payment amount for those services, room, and board. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 487.5(d).  ACFs are required to provide a broad range of

services to residents, including supervision, personal care, medication management, and case management.  *See id.* §§ 487.7, 488.7.

28.     ACFs receive government-funded subsidies.  For instance, they receive subsidies through the State Supplemental Payment program.  ACF residents who receive federal Supplemental Security Income qualify for a state supplement at a higher rate than individuals living on their own in the community.  A person living alone in the community receives a state supplement of $87, bringing their monthly income to $1030.  *See* N.Y. Soc. Serv. Law §§ 209(2)(a), 2(f).  ACF residents receive a state supplement of $694, which provides ACFs with a minimum monthly facility payment of $1,637.  *See id.* §§ 209(2)(e)-(f). 131-o.  Residents who have other forms of income may make a higher monthly facility payment.

29.     ACFs also receive state subsidies through the Enhancing the Quality of Adult Living program (EQUAL).  *See id.* § 461-s.  Although the program is intended to benefit residents, the funds are given to the facilities to use and the facilities use them for, among other purposes, making capital improvements to the facilities.  The program also allows ACFs to use EQUAL funds for corrective action to address regulatory violations.  *See id.* § 461(4).

30.     As discussed below, ACFs also receive Medicaid funds for their ALPs.

### Assisted Living Programs

31.     Some ACFs also run ALPs, which provide an option for residents who require more care and services than an ACF can provide and who are otherwise eligible for a nursing home.  *See id.* § 461-l.  The Department of Health ("DOH") licenses and regulates ALPs in ACFs.

32.     Specifically, ALPs may admit a person who:

(i) requires more care and services to meet his or her daily health or functional needs than can be directly provided by an adult care facility and although medically

7

eligible for placement in a residential health care facility, can be appropriately cared for in an assisted living program and who would otherwise require placement in a residential health care facility due to factors which may include but need not be limited to the lack of a home or a home environment in which to live and receive services safely; and

(ii) is categorized by the long-term care patient classification system as defined in regulations of the department of health as a person who has a stable medical condition and who is able, with direction, to take action sufficient to assure self-preservation in an emergency. In no event shall an eligible person include anyone in need of continual nursing or medical care, a person who is chronically bedfast, or anyone who is cognitively, physically or medically impaired to such a degree that his or her safety would be endangered.

*Id.* § 461-l(1)(d).

33.     ALPs are required to provide "at a minimum: room, board, housekeeping, supervision, personal care, case management activities and home health services."  N.Y. Comp. Codes R. & Regs. tit. 18, § 494.5(a).  These services must be provided as part of "an organized, 24-hour-a-day program of supervision, care and services."  *Id.* § 494.3(a).  The following services are included in the "medical assistance capitated rate":  personal care services which are reimbursable under title XIX of the Federal Social Security Act, home health aide services; personal emergency response services; nursing services; physical therapy; occupational therapy; speech therapy; medical supplies and equipment not requiring prior authorization; and adult day health care.  *Id.* § 494.5(b); N.Y. Soc. Serv. Law § 461-l(e).

34.     There are numerous benefits for individuals who reside in an ALP instead of a nursing home.  For one, nursing homes are more expensive than ALPs.  According to the DOH, nursing homes in New York City cost approximately $469 per day per resident, or about $171,276 a year.[1]

---

[1] *See Estimated Average New York State Nursing Home Rates*, N.Y. STATE P'SHIP FOR LONG TERM CARE, https://nyspltc.health.ny.gov/rates.htm (last visited May 15, 2024).

35.     The Medicaid program pays ALPs a daily rate for each resident in the ALP on top

of the resident's monthly fees.  *See* N.Y. Soc. Serv. Law § 461-l(1); N.Y. Pub. Health Law

§ 3614.  The payments are adjusted for the level of services that the resident is likely to need.

Medicaid pays ALPs between approximately $90.26 and $151.87 per resident per day,[2] about

$33,000 to $55,000 a year.

36.     ALPs cannot discontinue services for a resident solely because of cost, including

if the cost of the care exceeds the daily rate the ALP receives.  N.Y. Comp. Codes R. & Regs. tit.

18, § 505.35(h)(6).

37.     Moreover, nursing homes are a more segregated and restrictive setting than ALPs

– a more "institutional setting[]."[3]

### Defendants' Discriminatory Policies and Practices

38.     As set forth below, FHJC has discovered systemic discrimination against

individuals with mobility disabilities, and in particular, those who require the use of a wheelchair

(manual or electric) and have limited ability to walk or stand.

39.     Specifically, each Defendant refused to accept applications from testers who

posed as individuals seeking admission for a relative (a "test applicant") who required the use of

wheelchair, ***because*** of their need to use a wheelchair.

---

[2] *See January 1, 2018 Assisted Living Program Minimum Wage Rate Schedule*, N.Y. STATE DEP'T OF HEALTH, https://www.health.ny.gov/facilities/long_term_care/reimbursement/alp/2018-01-01_alp_min_wage_rates.htm (last visited on June 13, 2024).
[3] *See Report and Recommendations of the Olmstead Cabinet:  A Comprehensive Plan for Serving People with Disabilities in the Most Integrated Setting*, N.Y. STATE (Oct. 2013), at 10, https://www.ny.gov/sites/ny.gov/files/atoms/files/Olmstead_Final_Report_2013.pdf (last visited on June 13, 2024).

9

40.     Agents at Defendants' facilities made oral statements to the testers that residents cannot use wheelchairs and must have a certain level of mobility (standing, walking, self-propelling, etc.) to be considered for admission at Defendants' facilities.

41.     And indeed, the Amber Court homepage (which serves as the homepage for all Defendants) provides that:  "Wheelchairs can be utilized for outdoor excursions and indoors only when there are bedrooms on the main floor and there is availability of one of the rooms. This is so evacuation in an emergency is possible. For the safety of others, motorized wheelchairs are discouraged."[4]

42.     Defendants did not offer to conduct an individualized assessment of the test applicants to determine whether they were eligible for the housing and services Defendants provide at their facilities.  Instead, Defendants apply a blanket policy in refusing admission.

43.     Defendants failed to provide reasonable accommodations for prospective residents with certain mobility disabilities by prohibiting use of their wheelchairs as needed to enjoy equal access to and use of the facilities.

44.     Each Defendant has discriminated and continues to discriminate against people who use wheelchairs through the terms, conditions, and privileges of the housing and services offered at their respective ACF.

45.     Defendants' admission policies echo language from defunct regulations that were amended as a result of the FHJC's prior lawsuit challenging the original regulations as discriminatory.

---

[4] *Frequently Asked Questions*, AMBER COURT, https://ambercourtal.com/faq/ (last visited on June 13, 2024).

## History of Discriminatory Practices in Adult Care Facilities

46.     In 2018, FHJC brought an action against the New York State Department of Health ("DOH") and other defendants about ACF regulations that discriminated against wheelchair users and other individuals with mobility disabilities.  *See* Complaint, *Fair Housing Justice Center, Inc. et al. v. Cuomo et al.*, No. 18-CV-3196 (S.D.N.Y. Apr. 12, 2018), ECF No. 1.

47.     At that time, the DOH regulations prohibited admission or retention in an adult care facility of any person who was "chronically chairfast and unable to transfer, or chronically requires the physical assistance of another to transfer" as well as any person who "is chronically chairfast and requires lifting equipment to transfer or the assistance of two persons to transfer." N.Y. Comp. Codes R. & Regs. tit. 18, § 488.4(b) (2018).  The regulations also prohibited the admission or retention of individuals who needed assistance to use stairs or walk, unless they could be assigned to a floor with ground level egress.  *Id.*  § 487.4(c)(10) (2018).

48.     As a result of FHJC's litigation, DOH amended its regulations (some portions in May 2018 and others in February 2023) to remove those discriminatory provisions and require that facilities offer reasonable accommodations for individuals.  *Id.* §§ 487.4(b), 488.4(b), 494.4(b).

49.     The amended regulations provide that "[a]n operator shall not exclude an individual on the basis of an individual's mobility impairment, and shall make reasonable accommodations to the extent necessary to admit such individuals, consistent with federal, state, and local laws."  *Id.* § 487.4(b); *see also id.* §§ 488.4(b), 490.4(b).

50.     The DOH issued a Dear Administrator Letter ("DAL") dated April 25, 2023 describing the regulatory changes and announcing a webinar with further guidance for May 4,

2023.[5]  The DAL states that ACFs should adopt non-discrimination statements and reasonable

accommodation policies and attached models.  *See id.*

51.     The regulations further provide that a determination must be made as to whether

"the facility program can support the physical, psychological and social needs of the resident"

based on, *inter alia*, a medical evaluation and an interview.  *Id.* §§ 487.4(f), 488.4(e), 490.4(f).

52.     An individual assessment of applicants is thus not just a critical part of the

application process – it is required by regulation.

### FHJC's Investigation into Ongoing Discrimination

53.     Notwithstanding the DOH's amendments to its regulations, the Amber Court

website continued to promote discriminatory policies at certain adult care facilities, including

policies that exclude individuals who are "chronically chairfast and unable to transfer," in direct

contravention of the amendments made to DOH regulations.

54.     FHJC reviewed information from numerous sources, including the websites,

brochures, and other print and internet-based promotional materials for Defendants' ACFs and

ALPs.

55.     Based on these materials, FHJC conducted testing investigations at the following

homes: Amber Court of Brooklyn, Amber Court of Harbor View, Amber Court of Pelham

Gardens, Amber Court of Smithtown, Amber Court of Westbury, Amber Court of Westbury II,

and the Lake Shore Assisted Living Residence.

56.     The testing occurred between May 2023 and July 2023.

---

[5] *See* DAL# DACF 23-15,
https://health.ny.gov/facilities/adult_care/dear_administrator_letters/docs/dal_23-15.pdf (last
visited on June 13, 2024).

57.     Testers posed as family members of individuals seeking to apply to ALPs (so-called "test applicants").

58.      An initial tester called the facilities to inquire about housing on behalf of a relative who uses a wheelchair.  Then, a second tester called the same facility on behalf of a relative who either does not use a mobility device at all or uses a walker.

59.     These so-called "paired" phone tests allowed FHJC to determine whether there was, in fact, availability in the program and if it would be accessible to wheelchair users or whether the facility was discriminating against such individuals.

60.     The FHJC testers made audio recordings of contacts between the testers and agents for Defendants.

61.     The results of FHJC's testing evidenced a pattern and practice of discrimination against people who use wheelchairs (manual or electric) by each of Defendants in violation of the FHA, the Rehabilitation Act, and the ACA.

**Testing of Amber Court of Brooklyn (Defendant Amber Court of Brooklyn, LLC)**

62.     On June 12, 2023, an FHJC tester called Amber Court of Brooklyn on behalf of his aunt, a wheelchair user.  The tester spoke with the Director of Admissions, Olga Gorelik.

63.     Director Gorelik asked the tester questions about his aunt, including her age and medical conditions.  When the tester informed Director Gorelik that his aunt had advanced multiple sclerosis ("MS"), she asked if his aunt was able to walk.  The tester informed Director Gorelik that his aunt relies on her wheelchair for mobility.  Director Gorelik responded that there is onsite physical therapy that could help his aunt with walking.

64.     When asked whether individuals who rely on the use of wheelchairs would be admitted to the facility, Director Gorelik answered that "[t]ypically, admissions is not done for

13

somebody who is wheelchair bound" but that if there was a possibility that someone could eventually walk "even a little distance," "we will consider [them]."

65.     When the tester referred to the facility's webpage, which specifically discussed walker and wheelchair use, Director Gorelik replied that they have a no-motorized-wheelchair-use policy because "motorized wheelchairs are problematic because in case she loses control of the wheelchair or scooter, it may cause damage to other residents."

66.     Three days later, on June 15, 2023, a second tester called Amber Court of Brooklyn for his mother-in-law, who uses a walker.  The tester also spoke with Director Gorelik.

67.     When the tester asked whether his mother-in-law's use of a walker would hinder her application, Director Gorelik assured him that: "It's not a problem. Especially if [the] resident, uh came for admission and he was walking with a rolling walker and then gradually transferred to wheelchair."

**Testing of Amber Court of Harbor View in Brooklyn (Defendant Harbor View Senior Living Residence, LLC)**

68.     On June 12, 2023, an FHJC tester called Amber Court of Harbor View to inquire on behalf of his aunt, a wheelchair user.  This tester spoke with an admissions agent who identified herself by the name of Angelica (last name unknown).

69.     The tester asked Angelica about Amber Court of Harbor View's admissions process.  Angelica told the tester that there would be documents required and they would need to do an onsite assessment, "which is basically us getting a feel for her personality and seeing what her mobility is like."

70.     The agent informed the tester that there were rooms available and asked about his relative's age and primary diagnosis before asking about the relative's mobility.

71.     When the tester informed Angelica that his relative relies on her wheelchair for mobility, the agent asked whether "she [is] able to stand up on her own" and whether "she [is] able to bear weight on her feet?"  The tester said he believed she could but had not seen her in a while.

72.     The agent told the tester that being able to "bear weight on her feet" was an eligibility requirement and asked whether "she [is] able to maneuver the wheelchair by herself." The agent added: "that is one of our criteria as well.  They are allowed to be in a wheelchair, they just have to be able to self-propel."

73.     The tester informed Angelica that his relative prefers using a motorized wheelchair, to which Angelica responded, "Oh, so unfortunately we do not accept motorized wheelchairs."  When asked why, the agent responded: "I just think our community isn't large enough to handle that so all of our residents are in wheelchairs that they can self-propel themselves."

74.     On June 15, 2023, a second tester called the same facility on behalf of his mother-in-law, who uses a walker.  The tester spoke with the same admissions agent, Angelica.

75.     The tester informed Angelica that his mother-in-law uses a walker.  The agent confirmed there were rooms available and that the use of a walker was not an issue.

76.     When the tester raised the possibility his relative would need to transition to a wheelchair, Angelica replied that they would need to assess the relative's needs first and that it should be fine but, "we just ask that the wheelchair not be motorized and that they are able to self-propel themselves in the wheelchair."

15

**Testing of Amber Court of Pelham Gardens (Defendant Judith Lynn Home for Adults, LLC)**

77.     On July 5, 2023, an FHJC tester called Amber Court of Pelham Gardens on behalf of a test applicant relative who uses a wheelchair.  The tester spoke with Ashley Lopez, an admissions agent.

78.     The agent informed the tester that there would be a Zoom call to assess the applicant's medical condition, including to see her walk.  Ms. Lopez said, "[W]e would ask to see her walk because our residents have to be able to ambulate either independently or with like an assisted device, because we can't have any wheelchairs."

79.     When the tester informed Ms. Lopez that her relative has been using a "power wheelchair" for the last 20 years, she informed the tester that they could not admit a resident in a wheelchair because:

> We don't have the space here, our residents are, it's like, it's not in our contract. . . .  If the [S]tate came in to inspect and found we have wheelchairs, we could get fined. . .  The only residents who have the wheelchairs are the ones that are, um, doing physical therapy to build up the strength to walk again.

80.     Ms. Lopez also shared that there is an Amber Court in Brooklyn that "do[es] wheelchairs; we just, we can't."

81.     Upon hearing this, the tester raised her concern that her relative would have to move to Brooklyn, to which Ms. Lopez said that there were other facilities in the Bronx: "There might be one that does wheelchairs because [they're] assisted living alongside nursing home, so they might be able to accept wheelchairs."

82.     On July 6, 2023, a second tester called Amber Court of Pelham Gardens on behalf of his test applicant relative, who does not use a mobility device.  The tester also spoke with Ms. Lopez.

83.     During the call, Ms. Lopez said, "So, typically in order for us to start the process, we would need the last doctor's note, anything that states her current diagnosis, and a list of her current medication."  Ms. Lopez informed the tester that once the nurse determines that the applicant would be a good fit, she will set up a Zoom assessment, where she would

> ask questions about her medical history, . . . her vaccination status, if she's had any recent hospitalization, and then . . . would need to see her walk; she can use a cane or walker or whatever she uses.  We just need to make sure that she can ambulate enough to get from point A to point B.

## Testing of Amber Court of Smithtown in Nesconset (Defendant Amber Court @ Suffolk County LLC)

84.     On July 7, 2023, an FHJC tester called Amber Court of Smithtown on behalf of her aunt who uses a wheelchair.  The tester spoke with Cathie Cafferata, the Admissions Coordinator at Smithtown.

85.     When asked whether her aunt uses a mobility device, the tester informed Ms. Cafferata that her aunt is permanently disabled and uses a wheelchair due to a past car accident. Ms. Cafferata asked whether her aunt is able to use the restroom on her own, and the tester responded that she can transfer and use the restroom unassisted and that she is not incontinent. Ms. Cafferata told the tester that it "sounds like she would be a great fit here."

86.     Ms. Cafferata requested the tester's email and phone number to send further information and schedule a tour.

87.     Ms. Cafferata asked the tester whether her aunt propels herself, and the tester informed her that her relative always uses a power wheelchair.  Ms. Cafferata mentioned that she believed an "electric wheelchair" may not be permitted, but she was unsure because she is new at Amber Court.  She told the tester that she would find out and send over the answer along with

the additional information she had mentioned already so that they could hopefully schedule a tour.

88.     About two hours after the initial call, Ms. Cafferata left a voicemail for the tester stating that "unfortunately, due to safety concer[n]-reasons, they do not, um, allow an electric wheelchair" and that she was sorry that "it wouldn't work out for [the tester's aunt] here at Amber Court of Smithtown."

89.     The tester did not receive a follow-up email from Ms. Cafferata or any of the information that was promised about the program.

90.     On July 12, 2023, a second tester called Amber Court of Smithtown for his test applicant uncle, who does not use a mobility device.  This tester spoke with the same representative, Ms. Cafferata.

91.     After asking about the tester's uncle's current living situation, Ms. Cafferta went over the payment and room options and offered to email the information to the tester for review.

92.     Less than an hour after the phone call, Ms. Cafferata sent a follow-up email to the tester with an overview of the facility and a brochure, a Residential Options sheet, and three sample floor plans.

93.     Two days later, Ms. Cafferata left a follow-up voicemail for the second tester encouraging him to call or email her with any questions.

### Testing of Amber Court of Westbury (Defendants Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC)

94.     On July 7, 2023, an FHJC tester called Amber Court of Westbury on behalf of her aunt who uses a wheelchair.  The tester spoke with the Family Advisor, Christine Leroy.

95.     After going over payment and rooming options with the tester, Ms. Leroy requested the tester's email so that she could send more information.

18

96.     The tester informed Ms. Leroy that her aunt uses a wheelchair because of injuries from a past car accident.  Ms. Leroy reiterated that she would email the tester with more information and encouraged her to visit for a tour.

97.     The tester then asked whether the onsite activities would be accessible to her aunt given that she uses a power wheelchair.  Ms. Leroy asked, "Is she wheelchair-bound?  Can she walk a certain amount of feet at all?"

98.     The tester informed Ms. Leroy that her aunt is unable to walk or stand, to which Christine responded that "that does change things."  Ms. Leroy told the tester, "We do have our enhanced care license, um, but we just do not have it in our main population."  She explained that the enhanced care area houses a smaller population of residents but that the rooms there are wheelchair accessible.

99.     Ms. Leroy asked if the chair is an "electric wheelchair," and the tester confirmed it was.  Ms. Leroy repeated that residents needing more care are housed in a separate area but that those who are "wheelchair-bound" can be accommodated in the enhanced care facility given the enhanced care license.

100.    After the tester asked whether her aunt's wheelchair use and placement in the enhanced care facility would change costs, Ms. Leroy explained that it would increase the cost of care.

101.    Ms. Leroy twice noted that she would need to meet the tester's aunt to better evaluate her.

102.    At the end of the call, Ms. Leroy once again told the tester that she would send information via email and encouraged her to tour the facility.  However, Ms. Leroy never followed up by phone or email.

19

103.     On July 17, 2023, a second tester called Amber Court of Westbury for his uncle, who does not use a mobility device.  This tester spoke with a different representative, Jil Aliperti, the Director of Admissions.

104.     During the call, the tester noted that his uncle is "ambulatory" and does not use a cane or walker.

105.     Director Aliperti requested the tester's email so she could send information about the facility and offered to schedule a tour.

106.     In response to further questions, Director Aliperti encouraged the tester to first review the information she would email and then call back to discuss more.

107.     Less than an hour after the phone call, Director Aliperti sent a follow-up email to the tester that included an overview of the facility, an attachment with residential options, and a link to a YouTube video tour.

108.     The video tour of the Amber Court of Westbury sent to the second tester by Director Aliperti referred to "The Alcove," a special area for residents needing additional care. The video tour indicated that the enhanced care area was located on the lower level of the Alcove, a memory care unit was located upstairs.  The video tour noted that the Alcove had its own separate dining hall.

109.     Roughly a week after the call with the second tester, Director Aliperti left a voicemail for the tester, asking whether he received her email and whether he had any additional questions.

**Testing of the Lake Shore Assisted Living Residence of Lake Ronkonkoma (Defendant Lakehaven Equities, Inc.)**

110.    On July 6, 2023, an FHJC tester called The Lake Shore Assisted Living Residence on behalf of her aunt who uses a wheelchair.  The tester spoke with Admissions Director Lori Brandt.

111.    Director Brandt informed the tester that the facility assists residents with daily activities, such as using the bathroom, showering, providing meals, and housekeeping.  She also said the facility accepts private pay and Medicaid to pay for housing and services.

112.    When the tester informed Director Brandt that her aunt uses a power wheelchair, Director Brandt stated, "The only thing is that we, we can't have power wheelchairs here or power equipment."  When asked why, Director Brandt explained, "I guess they maybe get nervous of other residents [who may] go near it or the safety of it. . .  you know it's basically safety."  The tester then asked if that was just Lake Shore's policy or if it was a company-wide. Director Brandt replied, "For all of our Amber Courts, yeah."

113.    Before ending the call, Director Brandt asked the tester if her aunt could "self-propel," to which the tester responded that her aunt would not be able to do so.

114.    On July 7, 2023, a second tester called Lake Shore on behalf of his uncle who does not use a mobility device.  The second tester also spoke with Director Lori Brandt.

115.    Director Brandt informed the tester that there were available beds and that the applicant should come tour the facility and then fill out an application.  Following that, the facility would conduct an evaluation, or an assessment, to see if the facility could meet the individual's needs.  The assessment included asking for medical information to assess care level, financial information to see if the individual is eligible for Medicaid, and consideration of which floor plans would meet the individual's needs.

21

116.    Director Brandt encouraged the tester to visit the facility with his relative.

117.    After the tester's phone call with Director Brandt, that same evening, she emailed him a brochure, application, and residential options.

**COUNT I**
Fair Housing Act:
Discrimination based on Disability by Defendants

118.    Plaintiff FHJC repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

119.    Defendants own and lease dwellings, as defined by Section 802(b) of FHA, 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

120.    Defendants' conduct, as described above, constitutes making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on disability, in violation of Section 804(c) of the FHA, 42 U.S.C. § 3604(c).

121.    Defendants' conduct, as described above, constitutes representations made because of disability that a dwelling is not available for inspection or rent when such dwelling was in fact so available, in violation of Section 804(d) of the FHA, 42 U.S.C. § 3604(d).

122.    Defendants' conduct, as described above, constitutes discrimination in violation of Section 804(f)(1) of the FHA, 42 U.S.C. § 3604(f)(1) and (2).

123.    Defendants rejected test applicants who sought to live in Defendants' housing facilities, and who are disabled within the meaning of the FHA, ***because*** they used or wished to use a wheelchair (manual or electric) and had limited mobility, despite the fact that the residences had availability.

124.     Defendants' conduct, as described above, further constitutes discrimination against persons with disabilities by refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling in violation of Section 804(f)(3)(B) of the FHA, 42 U.S.C. § 3604(f)(3)(B).

125.     Defendants rejected test applicants based on their need or desire to use a wheelchair (manual or electric), without making any reasonable accommodation that would allow the test applicants access to Defendants' facilities.  Instead, they were refused accommodation.

126.     Defendants' conduct, as described above, further constitutes discrimination against persons with disabilities by making unlawful inquiries into the nature and severity of an individual's disability in violation of 42 U.S.C. § 3604(f) as implemented by 24 C.F.R. §100.201(c).

127.     Plaintiff FHJC is an aggrieved person as defined in 42 U.S.C. § 3602(i).  Plaintiff FHJC has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

128.     Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

129.     Accordingly, under 42 U.S.C. § 3613(c), Plaintiff FHJC is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorney's fees and costs.

### COUNT II
Rehabilitation Act:
Discrimination based on Disability by the Federally-Funded Defendants

130.     Plaintiff FHJC repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

23

131.    Certain Defendants' programs and activities receive federal financial assistance at least through the Medicaid program, including the programs run by the Federally-Funded Defendants.

132.    The Rehabilitation Act prohibits entities that receive federal financial assistance from discriminating against people with disabilities. 29 U.S.C. § 794a (as amended).

133.    Individuals who use wheelchairs and other mobility devices qualify as individuals with disabilities under the Rehabilitation Act.

134.    As set forth above, the Federally-Funded Defendants discriminated against and continue to discriminate against qualified individuals with disabilities who use wheelchairs or other mobility devices by refusing to admit them or retain them in their ACFs as a result of their disability.

135.    These Defendants' conduct, as set forth above, violates several provisions of the Rehabilitation Act.

136.    For one, the Rehabilitation Act requires that the Federally-Funded Defendants administer their programs in a manner that does not discriminate against people with disabilities and requires that they provide people with disabilities equal access to benefits and services.

137.    It further prohibits the Federally-Funded Defendants from "utiliz[ing] criteria or methods of administration the purpose or effect of which would … [d]efeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap. . . ."  24 C.F.R. § 8.4(b)(4).

138.    The Federally-Funded Defendants violate at least these provisions of the Rehabilitation Act by continuing to refuse to admit or to retain disabled individuals who require the use of a wheelchair (manual or electric).

139.     Moreover, the Federally-Funded Defendants are required to make reasonable accommodations in policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability.  29 U.S.C. § 794; 24 C.F.R. §§ 8.3, 8.4, and 8.20.

140.     The Federally-Funded Defendants have failed to make reasonable accommodations for individuals with mobility disabilities, including those who use wheelchairs (manual or electric) by failing to make changes to their policies, practices, or procedures that are necessary for those individuals to participate in and enjoy the benefits of their ACFs and ALPs.

141.     Plaintiff FHJC is a "person aggrieved" under the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), and has been injured by the Federally-Funded Defendants' discriminatory conduct and has suffered damages.

142.     Plaintiff FHJC is entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs.  29 U.S.C.A. § 794a.

### COUNT III
Patient Protection and Affordable Care Act:
Disability Discrimination by the Federally-Funded Defendants

143.     Plaintiff FHJC repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

144.     Section 1557 of the ACA prohibits discrimination against people with disabilities in any health program or activity that receives federal financial assistance.  *See* 42 U.S.C. § 18116(a); 45 C.F.R. § 92.4; 45 C.F.R. § 92.301.

145.     Section 1557 applies to the Federally-Funded Defendants because they administer health programs or activities and receive federal financial assistance through at least the Medicaid program.  45 C.F.R. § 92.4; *see also* Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,844 (defining "federal financial assistance" to include Medicaid

funds and defining "health program or activity" to include a "residential or community-based treatment facility, or other similar entity").

146.    Individuals who use wheelchairs and other mobility devices qualify as individuals with disabilities under Section 1557 of the ACA.

147.    Section 1557 requires, *inter alia*, that the Federally-Funded Defendants administer their programs in a manner that does not discriminate against people with disabilities and requires they provide people with disabilities equal access to benefits and services.

148.    The Federally-Funded Defendants discriminated against and continue to discriminate against qualified individuals with disabilities who use wheelchairs or other mobility devices, by refusing to admit them to or retain them in their ACFs because of their use of wheelchairs.

149.    Moreover, the ACA requires the Federally-Funded Defendants to make reasonable accommodations in policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability.  45 C.F.R. § 92.205.

150.    The Federally-Funded Defendants have failed to make reasonable accommodations to their policies, practices, or procedures that are necessary for individuals who use wheelchairs or other mobility devices to participate in and enjoy the benefits of Defendants' ACFs and ALPs.

151.    Plaintiff FHJC is an "aggrieved" person under Section 1557, and has been injured by the Federally-Funded Defendants' discriminatory conduct and suffered damages.  42 U.S.C. § 18116(b); 45 C.F.R. § 92.301.

152.     Plaintiff FHJC is entitled to compensatory damages, injunctive relief, and

reasonable attorney's fees, including litigation expenses and costs.  42 U.S.C. § 18116(a); 45

C.F.R. § 92.301.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment be entered against

Defendants as follows:

(a)     Declaring that Defendants' discriminatory practices violate the Fair Housing Act,

as amended, 42 U.S.C. § 3601 *et seq*., and that Federally-Funded Defendants'

practices violate Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,

and Section 1557 of the ACA, 42 U.S.C. § 18116;

(b)     Enjoining Defendants and their agents, employees, and successors, and all other

persons in active concert or participation from discriminating on the basis of

disability, including the following:

(i)     Making, printing, or publishing, or causing to be made, printed, or

published a notice, statement, or advertisement, with respect to the rental

of a dwelling that indicates a preference, limitation, or discrimination;

(ii)     Representing to any person that a dwelling is not available for inspection

or rental when such dwelling is in fact available;

(iii)     Denying or withholding housing or otherwise making housing unavailable

on the basis of disability;

(iv)     Discriminating in the terms, conditions, or privileges of rental;

(v)     Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling;

(vi)    Refusing to administer programs in a manner that does not discriminate against people with disabilities;

(vii)   Refusing to administer programs in a manner that provides people with disabilities equal access to benefits and services; and

(viii)  Using criteria or methods of administration the purpose or effect of which would defeat or substantially impair the accomplishment of the objectives of their federally assisted program or activity for qualified individuals with a particular handicap.

(c)     Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct alleged in this Complaint and to prevent repeated occurrences in the future.  Such affirmative steps should include, but are not limited to, the following:

(i)     Make all necessary modifications to their policies, practices, and procedures to comply with the Fair Housing Act, the Rehabilitation Act, and Section 1557 of the ACA;

(ii)    Eliminate the use of a "no wheelchair" policy;

(iii)   Eliminate the use of a "no motorized wheelchair" policy;

(iv)    Develop appropriate criteria for pre-admission screening of ACF residents based solely on resident suitability factors (e.g., level of needed assistance with activities of daily living);

(v)     Develop appropriate, non-discriminatory procedures for readmission of ACF residents who already have admission agreements;

(vi)    Adopt an anti-discrimination policy prohibiting discrimination based on disability, and in particular the use of wheelchairs and other mobility devices;

(vii)   Refrain from inquiring about a potential resident's use of a wheelchair during the application process;

(viii)  Train all management, agents, and employees on the Fair Housing Act, the Rehabilitation Act, and Section 1557 of the ACA;

(ix)    Advertise apartments and rooms available for rent and/or other available placements in a non-discriminatory manner, including displaying an Equal Housing Opportunity logo (or statement to that effect) on all print and internet advertisements and displaying in all offices and rental buildings appropriate fair housing law posters;

(x)     Use human models on websites and in other marketing materials that depict residents with mobility disabilities, including residents who use wheelchairs;

(xi)    Allow monitoring of their application and rental process;

(xii)   Retain advertising and rental records to allow for appropriate monitoring;

(xiii)   Develop written procedures on rental process and fair housing policy to be distributed to all employees, agents, tenants, and rental applicants; and

(xiv)   Establish a system for testing agents and employees for unlawful discriminatory practices.

(d)   Awarding such damages to Plaintiff FHJC as will fully compensate for the diversion of resources and frustration of mission caused by Defendants' unlawful practices;

(e)   Awarding punitive damages to Plaintiff;

(f)   Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

(g)   Granting Plaintiff such other further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

Dated:  New York, New York
        June 13, 2024

Respectfully submitted,


_____ */s/ Lisa E. Cleary* _____
Jota Borgmann (JB-1227)
Kevin M. Cremin (KC-4319)
MOBILIZATION FOR JUSTICE, INC.
100 William Street, 6th Floor
New York, New York 10038
(212) 417-3717
kremin@mfjlegal.org

Lisa E. Cleary (1993344)
Lachlan Campbell-Verduyn (5310545)
Joyce L. Nadipuram (5511522)
Saniya Suri (*pro hac vice* forthcoming)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
lecleary@pbwt.com

Attorneys for Plaintiff