UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FAIR HOUSING JUSTICE CENTER, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>Harbor View Senior Living Residence, LLC; Amber Court of Brooklyn, LLC; Lakehaven Equities, Inc.; Judith Lynn Home for Adults, LLC; Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC; Amber Court @ Suffolk County LLC,<br><br>Defendants. | 24 Civ. 4535 (KPF)<br><br>**SETTLEMENT AGREEMENT BY AND BETWEEN PLAINTIFF FAIR HOUSING JUSTICE CENTER AND DEFENDANTS HARBOR VIEW SENIOR LIVING RESIDENCE, LLC; AMBER COURT OF BROOKLYN, LLC; LAKEHAVEN EQUITIES, INC.; JUDITH LYNN HOME FOR ADULTS, LLC; AMBER COURT OF WESTBURY, LLC; AMBER COURT OF WESTBURY II, LLC; AMBER COURT @ SUFFOLK COUNTY LLC** |

This Settlement Agreement (the "Agreement") is entered into by and between Plaintiff Fair Housing Justice Center, Inc. (hereinafter, "Plaintiff" or "FHJC") and Defendants Harbor View Senior Living Residence, LLC; Amber Court of Brooklyn, LLC; Lakehaven Equities, Inc.; Judith Lynn Home for Adults, LLC; Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC; and Amber Court @ Suffolk County LLC (collectively, "Defendants"), by and through their respective counsel (together, the "Parties" and each a "Party").

**WHEREAS,** on June 13, 2024, Plaintiff filed a Complaint, alleging that Defendants discriminated against prospective residents based on their use of wheelchairs (manual or electric) at their adult care facilities in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001, *et seq.*;

**WHEREAS,** neither Party admits liability or wrongdoing in connection with this litigation;

**WHEREAS,** the Parties wish to voluntarily resolve the claims raised by Plaintiff in the Complaint, according to the terms set forth in this Agreement, as a compromise to avoid protracted expenses and litigation; and

**WHEREAS**, none of the provisions in this Agreement are intended to violate the regulatory requirements of New York law, and Plaintiff and Defendants do not believe that any of the provisions herein violate New York law;

**NOW, THEREFORE,** it is hereby stipulated and agreed, by and among the Parties, that all claims shall be compromised, settled, released, and dismissed upon and subject to the terms of this Agreement, as follows:

## I.    DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.    "FHJC" means the Fair Housing Justice Center, Inc.

2.    "Plaintiff" means FHJC.

3.    "Defendants" means Harbor View Senior Living Residence, LLC; Amber Court of Brooklyn, LLC; Lakehaven Equities, Inc.; Judith Lynn Home for Adults, LLC; Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC; and Amber Court @ Suffolk County LLC.

4.    "Facility" or "Facilities" means, individually or collectively:

a.    Amber Court of Brooklyn, located at 650 East 104th Street, Brooklyn, NY 11236;

b.    Amber Court of Westbury, located at 3400 Brush Hollow Road, Westbury, NY 11590 (the adult home and Assisted Living Residence as

well as the Enhanced Assisted Living Residence, and Special Needs
Enhanced Assisted Living Residence);

    c.    Amber Court of Smithtown, located at 130-132 Lake Avenue, Nesconset,
NY 11767;

    d.    the Lake Shore Assisted Living Residence, located at 211 Lake Shore
Road, Lake Ronkonkoma, NY 11779; and

    e.    Amber Court of Pelham Gardens, located at 1800 Waring Avenue, Bronx,
NY 10469.

5.    "Action" means *Fair Housing Justice Center, Inc. v. Harbor View Senior Living
Residence, LLC, et al.*, 24 Civ. 4535 (KPF), pending in the United States District Court for the
Southern District of New York.

6.    "Complaint" means the Complaint that Plaintiffs filed in this Action on June 13,
2024.

7.    "Applicant" refers to a prospective resident whose initial contact with the Facilities
was made either by the applicant directly, or by a relative, friend, or other person acting on the
applicant's behalf, or by an institutional referral source, such as a hospital, nursing home,
congregate care setting, or other health care, government, or social services entity.

8.    "Independent Applicant" refers to a prospective resident whose initial contact with
the Facility was made either by the applicant directly, or by a relative, friend, or other person acting
on the applicant's behalf.

9.    "Institutional Applicant" refers to a prospective resident whose initial contact with
the Facility is an institutional referral source, such as a hospital, nursing home, congregate care

setting, or other health care, government or social services entity, contacting the Facility on behalf of the prospective resident.

10.    "DOH" means the New York State Department of Health.

11.    "Assistive Mobility Device" means a power wheelchair, manual wheelchair, mobility scooter, rollator, rolling walker, or walker.

12.    "Assessment Forms" include the medical evaluation, mental health evaluation, and any other forms required prior to admission by DOH regulations or by Defendants.

13.    "Effective Date" means the latest date upon which this Agreement is executed by the Parties and approved by the United States District Court for the Southern District of New York.

14.    "Marketing Materials" refers to existing and new brochures, pamphlets, Websites, advertisements, videos, promotional materials included with application packets, and any other paper or digital documents used to advertise a Facility, to encourage people to apply for residency at a Facility, or to encourage people to refer potential applicants to a Facility, used by Defendants 45 days after the Effective Date.

15.    "Principal" means any natural person who is a principal, owner, managing partner, partner, or member of a Defendant.

16.    "Trainees" shall mean: the principal[1] of each Defendant; the administrator(s) of each Facility; and every employee at each Facility whose job duties include: (a) providing information to prospective residents about bed availability or the terms and conditions for admission or services offered at a Facility, (b) giving tours, (c) processing applications, (d) marketing or otherwise publicizing the services of a Facility, (e) setting financial or program

---

[1] For the avoidance of doubt, principals shall not include individuals who are only investors in a Facility and have no role in the admissions process.

quality targets as they relate to admission and retention decisions for a Facility, (f) implementing the Facility's policies regarding applications, admissions, room assignments, retention and termination of admission agreements, and requests for reasonable accommodations and/or modifications; and/or (g) making admission or retention decisions.

17.    "Policy Manual" refers to any documents used by Defendants to provide training or guidance to its employees, agents or representatives, including the following: (i) any training or guidance about the Non-Discrimination Policy and the Reasonable Accommodation Policy described in Section V of this Agreement; (ii) marketing activities; or (iii) the Admission Process and the Retention Review Process described in Section VI of this Agreement.

18.    "Website" refers to any webpage maintained by or on behalf of Defendants for advertising purposes or informational use by potential applicants to, or residents of, the Facility or persons acting on their behalf.

## II.    TERM AND SCOPE OF AGREEMENT

1.    All obligations under this Agreement, unless otherwise specified, shall commence within thirty (30) days after the Effective Date and shall continue for four (4) years thereafter (the "Settlement Period"), except where specified otherwise.

2.    The Parties warrant and represent that they (i) have the power and authority to bind themselves as necessary and to execute and deliver this Agreement; (ii) have the power, authority and ability to perform their obligations hereunder; (iii) are the owners of all claims asserted or that could have been asserted that are being released, and have not assigned or transferred, or purported to assign or transfer, voluntarily or involuntarily, or by operation of law, all or any portion of such claims or any claim, right or interest that is agreed to be released in this Agreement; and (iv) have entered into this Agreement freely, voluntarily and knowingly with an adequate opportunity to

consult with the attorneys of their choice prior to entering into this Agreement.  The Parties further represent that the making and performance of this Agreement will not violate any provisions of law, or any other agreement with any person or legal entity by which that Party is bound.

3. This Agreement shall be binding on Plaintiff and Defendants and all of their Principals, employees, agents, representatives, officers, heirs, assigns, subsidiaries, parents, officers, directors, shareholders, and any person or entity acting through or in concert with any preceding persons or entities, or successors in interest, unless otherwise specified.

4. The terms of this Agreement shall apply to the policies, procedures, and operation of each of the Facilities, unless otherwise specified.

## III. JURISDICTION AND ENFORCEMENT

1. The United States District Court for the Southern District of New York (the "District Court") shall retain jurisdiction to enforce the terms of this Agreement.  The District Court may enforce the terms of this Agreement upon the filing of an appropriate motion by either Party.  The Parties to this Agreement shall endeavor in good faith to informally resolve any differences regarding compliance with and interpretation of this Agreement.  The Parties agree to seek Court intervention only for substantial matters that impair or threaten to impair the benefits a Party sought to enjoy under this Agreement.

2. Prior to filing any motion to enforce or modify the terms of this Agreement, a Party must:

  a. Provide written notice of any instance of alleged noncompliance with the Agreement to the other Party;

  b. Within twenty (20) days of written notice being provided, meet and confer in good faith concerning such alleged noncompliance;

c.     Allow an opportunity of no less than thirty (30) days following the meet and confer in which the allegedly noncompliant Party may cure any noncompliance; and

d.     During the thirty (30) day cure period, continue to meet and confer in good faith concerning any unresolved dispute about compliance or cure.

3.     If the allegedly noncompliant Party fails to cure within thirty (30) days as provided in Paragraph 2(c) of this Section above, either Party may request a conference with the District Court.  If, within sixty (60) days of a Party's request for a conference to the District Court, the alleged noncompliance is not resolved or a conference is not held, either Party may file an appropriate motion for relief with the District Court.

## IV.   MONETARY RELIEF AND PERMANENT INJUNCTION

1.     Defendants shall pay Plaintiff a total sum of $399,000 (the "Settlement Amount") in full and final settlement of Plaintiff's monetary claims in this Action, including: $39,000 in compensation for Plaintiff's investigation of Defendants' conduct and costs for putting out corrective information; $210,000 for monitoring as described in Sections VII, and $150,000 in attorneys' fees and costs.

2.     The Settlement Amount shall be delivered by a certified check via overnight mail to counsel for Plaintiff at Patterson Belknap Webb & Tyler LLP, 1133 Avenue of the Americas, New York, NY 10036, Attn: Lisa E. Cleary, Esq., within fourteen (14) business days of the Effective Date.  The date upon which the Settlement Amount is received by counsel for Plaintiff and the certified check clears shall be the "Release Date."

3.     The purpose of this Agreement is:  (a) to ensure that persons seeking or inquiring, directly or through another person or entity, about admission to a Facility and current residents

who want to continue residing at a Facility are not denied admission or continued residency because of use of a wheelchair or other Assistive Mobility Device; and (b) to ensure that those using a wheelchair or Assistive Mobility Device are provided reasonable accommodations or modifications where needed to afford them equal opportunity to use and enjoy the Facility's housing and services consistent with applicable federal, state and local laws, rules and regulations; and (c) to ensure that the Defendants comply with applicable federal, state and local laws, rules and regulations.

4. Defendants agree to be bound by the Consent Judgment and Permanent Injunction attached as **Exhibit A**, which provides for, *inter alia*, the dismissal of the action with prejudice ("Consent Judgment and Permanent Injunction"). The Parties agree to stipulate that dismissal shall be with prejudice. The Parties also agree to stipulate that the order shall vest the Court with continuing jurisdiction for the sole purpose of enforcing the terms of the Agreement. Counsel for Plaintiff shall file the executed Consent Judgment and Permanent Injunction with the Court within fourteen (14) business days of the Release Date.

5. Plaintiff and Defendants waive any rights to appeal the entry of the Consent Judgment and Permanent Injunction. The terms of the Consent Judgment and Permanent Injunction are incorporated into this Agreement as if fully set forth herein.

## V.    NON-DISCRIMINATION AND REASONABLE ACCOMODATION POLICY AS TO ALL FACILITIES

### A.    Non-Discrimination.

1. Defendants shall adopt the "Non-Discrimination Policy" attached hereto as **Exhibit B** regarding nondiscrimination against individuals with mobility impairments, including individuals who rely on wheelchairs, motorized wheelchairs, or other Assistive Mobility Devices.

2.      Within forty-five (45) days after the Effective Date, the Non-Discrimination Policy shall be included in the Policy Manual and shall be distributed to current employees involved in admissions and retention decisions and all Trainees as defined in this Agreement along with a notification that the Policy Manual contains a new legally-required Non-Discrimination Policy that must be reviewed. The Non-Discrimination Policy shall be distributed to new Trainees at the time they are hired.

3.      Within forty-five (45) days after the Effective Date, the Non-Discrimination Policy shall be provided to applicants (i) at or before the interview during any assessment/review stage of such applicant's application for admission and (ii) with any admission agreement. If any applicant is interviewed prior to forty-five (45) days after the Effective Date and not provided the Non-Discrimination Policy and such applicant's pending application is denied more than forty-five (45) days after the Effective Date, such applicant shall be provided the Non-Discrimination Policy upon being informed of the denial.

4.      Within forty-five (45) days after the Effective Date, the Non-Discrimination Policy shall be distributed to current residents.

**B.      Reasonable Accommodation**

1.      Defendants shall adopt the "Reasonable Accommodation and Modification Policy" attached hereto as **Exhibit C**.

2.      Within forty-five (45) days of the Effective Date, the Reasonable Accommodation and Modification Policy shall be included in the Policy Manual and shall be distributed to current employees involved in admissions and retention decisions and all Trainees as defined in this Agreement along with a notification that the Policy Manual contains a new legally-required Reasonable Accommodation Policy that must be reviewed. The Reasonable Accommodation and

Modification Policy shall be distributed to new employees involved in admission and retention decisions at the time they are hired.

3.      Within forty-five (45) days after the Effective Date, the Reasonable Accommodation and Modification Policy shall be provided to applicants (i) at or before the interview during any assessment/review stage of such applicant's application for admission and (ii) with any admission agreement. If any applicant is interviewed prior to thirty (30) days after the Effective Date and not provided the Reasonable Accommodation and Modification Policy and such applicant's pending application is denied more than thirty (30) days after the Effective Date, such applicant shall be provided the Reasonable Accommodation and Modification Policy upon being informed of the denial.

4.      Within forty-five (45) days after the Effective Date, the Reasonable Accommodation and Modification Policy shall be distributed to current residents.

**C.      Marketing materials.**

1.      Within forty-five (45) days after the Effective Date, all Marketing Materials used by Defendants shall reference the Facility's Reasonable Accommodation and Modification Policy and the Facility's Non-Discrimination Policy.

2.      Within forty-five (45) days after the Effective Date, Marketing Materials using human models or figures will include at least one such model or figure who is a person using a wheelchair. Models or figures, if used, will portray persons in equal social settings.

3.      Defendants agree to adhere to the HUD guidance on human models, a copy of which is attached hereto as **Exhibit D**.

4.      Defendants shall use the fair housing logo and/or "equal housing opportunity" on all Marketing Materials.

5.      Defendants shall place HUD/City Fair Housing posters at each Facility in a conspicuous location accessible to prospective and current residents and other members of the public.

6.      Defendants shall give to applicants and residents the brochure attached as **Exhibit E**, or such other government-published brochure agreed to by FHJC that provides information to people with disabilities about their fair housing rights.

  **D.**  **Training.**

1.      Trainees shall receive training once per year on provisions of the Fair Housing Act, Rehabilitation Act, Americans with Disabilities Act, New York State Human Rights Law, and New York City Human Rights Law, that prohibit discrimination based on disability at facilities such as Defendants' Facilities. As part of those annual trainings, Trainees will receive training on Defendant's Non-Discrimination and Reasonable Accommodation and Modification Policies adopted contemporaneously with this Agreement. The first of the training shall occur no later than six months after the Effective Date.

2.      The training will be conducted by an independent trainer selected from the list of trainers attached hereto as **Exhibit F**, or a trainer otherwise mutually agreeable to the Parties.

3.      Defendants shall provide Plaintiff advance notice of the date, time, and location of the trainings.

4.      Once a year during the Settlement Term, Defendants shall provide documentation to Plaintiff confirming that all Trainees received the annual training.

  **E.**  **Prohibition Against "No Wheelchair" Policy or Practice.**

1.      Employees of the Facilities shall not communicate any form of a "no wheelchair" policy or practice to persons inquiring about residency, to any applicant or resident, or any representative of an applicant or resident.

2.      Within forty-five (45) days after the Effective Date, using a form letter attached hereto as **Exhibit G**, Defendants shall inform the referral sources (defined below) to the Facility that Defendants will not deny admission on the basis of mobility impairment without affording the prospective resident the opportunity to participate in the reasonable accommodation process, as described by the Reasonable Accommodation Policy adopted contemporaneously with this Agreement.  A copy of each letter shall be provided to Plaintiff's counsel at the time they are disseminated.  Defendants shall distribute its Non-Discrimination Policy to referral sources every six (6) months in the first year following the Effective Date and every twelve (12) months thereafter during the Settlement Period to ensure ongoing non-discrimination.  For purposes of this paragraph, "referral source" shall include any entity or individual or other method of referral that has referred at least three (3) potential applicants to the Facility within the immediately preceding year.  With respect to referrals through Defendants' Website, Defendant shall satisfy its obligations with respect to this Paragraph by posting its Non-Discrimination Policy and its Reasonable Accommodation and Modification Policy on its Website.

3.      Defendants shall not reject any applicant or terminate any resident on the basis that such individual is a person who uses a wheelchair for mobility, without affording any such applicant or resident the opportunity to participate in the reasonable accommodation process, as described by the Reasonable Accommodation Policy adopted contemporaneously with this Agreement.

## VI.    ADMISSION PROCESS FOR APPLICANTS/RETENTION PROCESS FOR CURRENT RESIDENTS

1.      The admission process for Defendants shall include the following three stages in sequential order: (1) Referral; (2) Assessment/Review; and (3) Determination.  The Referral Stage may vary for Individual and Institutional Applicants, as set forth below, but the Assessment/Review and Determination stages shall generally be the same for all applicants.

**A.  Referral Stage.**

This stage shall include any initial inquiries, up to the submission of documentation required by DOH regulation prior to admission.

1.  Independent Applicants.

    a.  During informal, pre-assessment interactions, and throughout the application process, Defendants shall provide Independent Applicants with information about the services offered and admissions/eligibility requirements. Defendants shall explain the Non-Discrimination Policy and Reasonable Accommodation and Modification Policy upon request, or if a mobility impairment or use of a wheelchair or other Assistive Mobility Device has been disclosed unsolicited.

    b.  Defendants shall disseminate any written materials, to the extent they exist, regarding services provided and general admissions/eligibility requirements to all Independent Applicants.

    c.  Defendants shall not, at the time of initial telephone inquiries, tours, meetings, or other informal interactions occurring before the Assessment Stage, screen out or reject Independent Applicants with mobility impairments or who use a wheelchair or other Assistive Mobility Device, or deter Independent Applicants with mobility impairments or who use a wheelchair or other Assistive Mobility Device from proceeding to the Assessment/Review stage.

13

d.  At the referral stage, Defendants shall not inquire about mobility impairments, use of a wheelchair or other Assistive Mobility Device, or service needs specific to individuals with mobility impairments or use of a wheelchair or other Assistive Mobility Device, such as assistance with walking, climbing or descending stairs, or assistance with transferring, of the Independent Applicant.

e.  If a Facility has no empty beds, an Independent Applicant can request to be placed on the waitlist, as described below in Section VI.D of this Agreement. Defendants shall document any periods of time where a Facility has no empty beds and provide that documentation to FHJC according to Section VII of this Agreement.

2.  <u>Institutional Applicants.</u>

Defendants shall not inquire about mobility impairments or use of a wheelchair or other Assistive Mobility Device at the Referral Stage or decline an interview, assessment, or follow-up to an Institutional Applicant based on mobility impairments or use of a wheelchair or other Assistive Mobility Device that were disclosed without solicitation.

3.  <u>Application Tracking.</u>

Defendants shall ensure that its records tracking the outcome of each Institutional and Independent Applicant includes:

(1) Name of referral source and contact information;

(2) Date of initial inquiry;

(3) Name of potential applicant;

(4) Whether mobility impairment was disclosed prior to assessment, and if so how and by whom;

(5) Whether the candidate proceeded to assessment, and if not, why not;

14

(6) If assessed, whether applicant had a mobility impairment;

(7) For applicants with mobility impairments: the type of mobility impairment; and outcome of application; and

(8) Specific basis for any denial.

The records will be kept in a form substantially similar to **Exhibit H**, attached hereto, provided, however, Defendants shall have the right to expand such form to collect additional information that it deems necessary or advisable for its business, marketing and operational activities.

**B. Assessment/Review Stage.**

1.    The Assessment portion of the Assessment/Review Stage shall involve acquiring such information as Defendants need to make an admission decision, which includes the completion of the Assessment Forms, an interview and all other steps required by DOH regulations. Following or in the process of the Assessment portion of this stage, the Facility shall review the information provided to it and determine whether the Facility can meet the needs of the Independent or Institutional Applicant, at which point mobility may be considered.

2.    Defendants shall not refuse any applicant access to the Assessment/Review Stage on the basis that the individual has a mobility impairment or uses a wheelchair or other Assistive Mobility Device.

3.    Defendants shall not discourage or deter Independent or Institutional Applicants from proceeding to the Assessment/Review Stage based on a mobility impairment or use of a wheelchair or other Assistive Mobility Device.

4.    Defendants shall retain a record of each inquiry or referral received.  Defendants shall also retain any information collected or considered before making an admission decision for

prospective residents that reach the Assessment/Review Stage, including but not limited to the Assessment Forms and a record of the outcome of each applicant who progresses to the Assessment/Review Stage.

5.      If the Facility determines that it could meet the mobility needs of the applicant by granting a reasonable accommodation or modification, whether or not such accommodation or modification was requested, it shall offer such reasonable accommodation or modification.

      **C.**      **Determination stage.**

1.      Each Facility shall complete the Notice of Admission Determination form attached hereto as **Exhibit I** for every Independent Applicant or Institutional Applicant who proceeded to the assessment stage and was denied admission in full or in part based on mobility issues.

2.      The Facility shall send the completed Notice of Admission Determination to denied Individual Applicants and, upon request, to denied Institutional Applicants.

3.      The Notice of Admission Determination shall explain the reason for denial, referring to details of the Assessment Forms and:

      a.      The Facility's current safety plan/evacuation plans if the denial is due to safety concerns; or

      b.      The Facility's staffing and resident population; or

      c.      Specific statutory or regulatory provision(s) that preclude admission.

4.      Nothing contained herein is intended to, nor shall it be interpreted as, altering the legal responsibilities and obligations under city, state, and federal law of Defendants with respect to:

      a.      what is a reasonable accommodation or modification; or

      b.      who bears the costs of such accommodation or modification.

5.      All Denial Forms/Determination Notices shall be retained by the Facility for five (5) years.

**D.      Waiting List.**

To the extent that a denial is based on limited staffing, room availability, or the resident population that could change in the future, and where the applicant does not require immediate placement, Defendants shall establish a waiting list for such applicants and notify them if/when the Facility they applied to is able to accommodate the applicant at a future date. Such applicants shall be told that they have been placed on a waiting list and that they will be maintained on the waiting list for at least two (2) years after their application is denied.

**E.      Retention Review for Current Residents.**

1.      Decisions to terminate residency because a resident's needs exceed the regulatory retention standards based in full or in part on mobility issues shall be assessed and documented in the same manner as admission assessments, as set forth in this Agreement.

2.      For each resident who uses a wheelchair or other Assistive Mobility Device and is discharged from the Facility (whether voluntarily or involuntarily) because their physical needs exceed the regulatory retention standards, Defendants shall complete the termination form attached hereto as **Exhibit J**.

3.      For any discharge, if an outside provider or medical facility determines that the resident is appropriate for placement in an enriched housing program or assisted living program, this must be acknowledged in the documentation and specifically addressed by Defendants.

4.      If a Defendant decides to terminate an admission agreement, including any determination that a resident has been permanently discharged from the Facility, it must provide the resident with a notice of termination as required by statute and follow the statutory and

17

regulatory framework for terminating the admission agreement. Defendants shall transmit copies of all such notices of termination to FHJC's counsel within ten (10) business days of the notice for residents whose residency is terminated in whole or in part due to mobility issues.

## VII.    MONITORING

1.    During the Settlement Period, Defendants shall retain copies of all records described in Sections V and VI.

2.    FHJC may conduct compliance testing of the Facility during the Settlement Period.

3.    Upon reasonable written notice, Defendants will permit FHJC to inspect and copy the records described in Sections V.C, VI.A.3, VI.B.1, VI.B.4. VI.B.5, VI.C.1, VI.E.2 of this Agreement during the Settlement Period. FHJC will keep confidential all information it inspects and copies pursuant to the terms of this Agreement and will use the information for the sole purpose of monitoring compliance with this Agreement. If FHJC is served with a court order, subpoena or other similar legal process that purports to require the production of any such confidential information to any tribunal or party other than Defendant, FHJC agrees to notify Defendants prior to producing any such confidential information and, if reasonably possible, at least ten (10) business days before the time within which FHJC is required to produce such confidential information.  Nothing in this provision or the parties' Agreement will preclude Defendants from complying with their Health Insurance Portability and Accountability Act (HIPAA) obligations.

4.    During the Settlement Period, Defendants will submit any proposed changes to the records described in VI.A.3, VI.B.4, IV.C.1, VI.E.2 of this Agreement to FHJC for review and approval prior to implementation of those changes.

18

5.      During the Settlement Period, Defendants will provide semi-annual (every six months) reports to FHJC about: (i) the number of open spots at Defendants' Facilities; (ii) the number of applications received for the open spots; (iii) documentation reflecting the assessment applicants underwent or Defendants' evaluation of the applications for the spots as well as the reasons given to applicants who were refused admission for the open spots; (iv) correspondence between Defendants' and applicants about applications for the open spots; (v) the number of wheelchair users or users of Assistive Mobility Devices that applied for open spots in that time period and records about whether those applicants received a spot; (vi) a list of reasonable accommodations given to any applicant in that six-month period; and (vii) any complaints received by Defendants' Facilities about discrimination during admissions.

## VIII.   RELEASES AND RESERVATION OF RIGHTS

1.      In exchange for Defendants' agreement to the terms set forth in this Agreement and payment of the monetary relief described above, effective upon the Release Date, Plaintiff fully and forever releases, acquits, and forever discharges with prejudice, subject to the terms of this Agreement, Defendants and all their Principals, employees, agents, representatives, officers, heirs, assigns, subsidiaries, parents, officers, directors, shareholders, and any person or entity acting through or in concert with any preceding persons or entities, successors in interest, attorneys, and insurers of Defendants from any and all liability, claims, or rights of action, of any kind or nature whatsoever occurring from the beginning of time through the Effective Date arising from Defendants' conduct as described in this Action.  For the avoidance of doubt, nothing in this Settlement Agreement shall affect Plaintiff's ability to bring claims against Defendants based on future conduct.

2.      Plaintiff expressly reserves the right to advise any individuals who were affected or harmed by Defendants' conduct as described in this Action should such individuals come forward or be identified as part of Plaintiff's regular operations, including its complaint process.

3.      Effective upon the Release Date, Defendants fully and forever release, acquit, and forever discharge with prejudice, subject to the terms of this Agreement, Plaintiff and its directors, employees, agents, representatives, officers, heirs, assigns, subsidiaries, parents, officers, directors, shareholders, and any person or entity acting through or in concert with any preceding persons or entities, successors in interest, attorneys and insurers from any and all liability, claims, or rights of action, of any kind or nature whatsoever arising from the beginning of time through the Effective Date (hereinafter, "Defendants' Released Claims") relating to this Action.

4.      Nothing herein shall be interpreted as releasing any rights and obligations created by this Agreement, or to prohibit any Party from enforcing any rights or performing any obligations that they may have under this Agreement.

## IX.    NOTICE

Whenever this Agreement requires or contemplates that the Parties shall or may give notice to each other, notice shall be provided by both (i) electronic mail and (ii) next business day express delivery service, to the addresses set forth below, which notice shall be deemed effective upon delivery:

To Plaintiff:

> Mobilization for Justice, Inc.
> 100 William St., 6th Floor
> New York, NY 10038
> Attn:   Kevin Cremin, Esq.
>         Jota Borgman, Esq.
> Email: kcremin@mfjlegal.org
>        jborgmann@mfjlegal.org

Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10019
Attn:   Lisa E. Cleary, Esq.
Email: lecleary@pbwt.com

To Defendants:

Herrick, Feinstein LLP
Two Park Avenue
New York, New York 10016
Attn:   Avery S. Mehlman, Esq.
Email: AMehlman@herrick.com

## X.    CONSTRUCTION AND SEVERABILITY

1.    This Agreement shall be deemed to have been jointly drafted, and no provision herein shall be interpreted or construed for or against any Party because such Party drafted or requested such provision or this Agreement as a whole.

2.    If any provision in this Agreement is declared invalid or unenforceable by a court having competent jurisdiction, it is mutually agreed that this Agreement shall endure except for the part declared invalid or unenforceable by order of such court, unless the elimination of the invalid provision shall materially affect the intent of the Agreement. The Parties agree that payment of the Settlement Amount as provided herein is a material term of this Agreement. The Parties to this Agreement shall consult and use their best efforts to agree upon a valid and enforceable provision that shall be a reasonable substitute for such invalid or unenforceable provision in light of the intent of this Agreement.

3.    This Agreement contains all the terms and conditions agreed upon by the Parties hereto, and no prior communications, whether oral or in writing, or oral or written agreement entered into prior to the execution of this Agreement regarding the subject matter of the instant

proceeding shall be deemed to exist, to bind the Parties hereto, or to vary the terms and conditions contained herein.

4.    The Parties agree that this Agreement, so-ordered by the District Court, complies with HIPAA, as it constitutes a court order for purposes of 45 CFR 164.512(e), protecting the confidentiality of documents and information Defendants are obligated to provide to Plaintiff during the Settlement Period for the limited purpose of monitoring Defendants' compliance with this Agreement, with the District Court maintaining jurisdiction to enforce this Agreement. In the event that disclosure of protected health information under this Agreement is challenged by any individual, entity, or governmental agency, Defendants shall promptly notify Plaintiff and shall oppose such challenge. In the event that such disclosure is found to violate HIPAA or other privacy law, Defendants shall promptly notify Plaintiff and the Parties shall meet and confer and/or seek a conference with the District Court within thirty (30) days after such finding. During the pendency of such meet and confer or conference with the District Court, and until such time as the violation of HIPAA or other privacy law is remedied via either an amendment to this Agreement or further order of the District Court, Defendants shall have no obligation to comply with the provisions of this Agreement to the extent such obligations have been determined to violate HIPAA or other privacy law.

5.    The Parties agree this Agreement shall be subject to and interpreted in accordance with the laws of the State of New York, exclusive of any choice of law rules that would require the application of laws other than those of the State of New York.

6.    The failure or delay by a Party to require performance of any provision hereof shall not affect that Party's right to require performance at any time thereafter, nor shall a waiver of any

breach or default constitute a waiver of any subsequent default or a waiver of the provision itself or any other provision.

7.     This Agreement may be executed in any number of counterparts and each such counterpart shall be deemed to be an original. For purposes of executing this Agreement, a document signed and transmitted by facsimile or email shall be treated as an original document and have the same binding legal effect as an original signature on an original document.

*[the remainder of this page is intentionally blank]*

IN WITNESS WHEREOF, the Parties hereto by their duly authorized representatives have executed this Settlement Agreement on the dates indicated below:

**Fair Housing Justice Center, Inc.**         **Defendants**

By: _____         By: _____

Print Name: Michele Cortese                 Print Name: _____

Title: Interim Executive Director           Title: _____

Date: ___1/16/25_____                     Date: _____


It is so ORDERED this _____ day of _____, 2025.

_____

IN WITNESS WHEREOF, the Parties hereto by their duly authorized representatives have
executed this Settlement Agreement on the dates indicated below:

**Fair Housing Justice Center, Inc.**

By:_____

Print Name: Michele Cortese

Title: Interim Executive Director

Date:_____

Defendants

By:_____

Print Name: Robert Snyder

Title: Coo

Date: 1/15/2025

It is so ORDERED this 21 day of _____January_____, 2025.

Katherine Polk Failla

Hon. Katherine Polk Failla
United States District Judge

24

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Fair Housing Justice Center, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Harbor View Senior Living Residence, LLC; Amber Court of Brooklyn, LLC; Lakehaven Equities, Inc.; Judith Lynn Home for Adults, LLC; Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC; Amber Court @ Suffolk County LLC, <br><br> Defendants. | 24 Civ. 4535 (KPF) <br><br> **CONSENT JUDGMENT AND PERMANENT INJUNCTION** |

On consent of Plaintiff Fair Housing Justice Center (hereinafter "Plaintiff"), and Defendants Harbor View Senior Living Residence, LLC; Amber Court of Brooklyn, LLC; Lakehaven Equities, Inc.; Judith Lynn Home for Adults, LLC; Amber Court of Westbury, LLC; Amber Court of Westbury II, LLC; Amber Court @ Suffolk County LLC (hereinafter "Defendants") it is hereby ORDERED, ADJUDGED, AND DECREED:

WHEREAS, on June 13, 2024, Plaintiff filed an action captioned *Fair Housing Justice Center v. Harbor View Senior Living Residence, LLC, et al.*, No. 24-cv-4535 (the "Action") in the United States District Court for the Southern District of New York (the "Court") against the Defendants ("the Action");

WHEREAS, pursuant to the Settlement Agreement dated _____, and filed with the Court on ___ (ECF No. ___) (the "Settlement Agreement"), Plaintiff has agreed to dismiss this case, in its entirety with prejudice;

WHEREAS, pursuant to the Settlement Agreement, Plaintiff and Defendants agreed that the Court shall have continuing jurisdiction to enforce the terms of the Agreement;

NOW THEREFORE:

1. To the fullest extent permitted under Rule 65 of the Federal Rules of Civil Procedure, Defendants and their principals, agents, servants, employees, successors, assigns and all other persons in concert and in participation with them, will be permanently enjoined from discriminating on the basis of disability, including the following:

    a. Making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination;

    b. Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact available;

    c. Denying or withholding housing or otherwise making housing unavailable on the basis of disability;

    d. Discriminating in the terms, conditions, or privileges of rental;

    e. Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling;

    f. Refusing to administer programs to qualifying individuals in a manner that does not discriminate against people with disabilities;

    g. Refusing to administer programs to qualifying individuals in a manner that provides people with disabilities equal access to benefits and services;

    h. Retaliating against Plaintiff in any manner for instituting this Action, or any individual for participating in this Action; and

3

      i.   Using criteria or methods of administration the purpose or effect of which would defeat or substantially impair the accomplishment of the objectives of their program or activity for qualified individuals with a particular disability.

2. Plaintiff and Defendants each agree that jurisdiction and venue for an action for contempt of this Consent Judgment exists in the United States District Court for the Southern District of New York. In such an action, Defendants shall waive any and all defenses based upon personal jurisdiction, subject matter jurisdiction, and venue.

3. This Consent Judgment is entered pursuant to Rule 58 of the Federal Rules of Civil Procedure, and this Action is hereby dismissed, with prejudice, as to Defendants, save that this Court shall retain jurisdiction over this Action, including, without limitation, over implementation of or disputes arising out of this Consent Judgment with regard to Defendants as well as all those falling within the scope of Rule 65(d)(2)(A)-(C) of the Federal Rules of Civil Procedure.

4. The terms of the Settlement Agreement are incorporated into this Order.

5. Plaintiff and Defendant shall each bear their own fees and costs, except as outlined by the Settlement Agreement.

6. Signatures to this Consent Judgment transmitted electronically or by facsimile shall be deemed original.

FOR PLAINTIFF:

PATTERSON BELKNAP WEBB & TYLER


By:_____          Dated:_____, 2025
     Lisa A. Cleary
     Lachlan Campbell-Verduyn
     Joyce Nadipuram
     Saniya Suri
     1133 Avenue of the Americas
     New York, NY 10036
     Tel: 212-336-2000


MOBILIZATION FOR JUSTICE, INC.


By:_____          Dated:_____, 2025
     Kevin M. Cremin
     Jota Borgmann
     100 Williams Street
     New York, NY 10038
     Tel: 212-417-3700

FOR DEFENDANTS:

HERRICK, FEINSTEIN LLP


By:_____          Dated:_____, 2025
      Avery S. Mehlman
      Two Park Avenue
      New York, NY 10016
      Tel: (212) 592-5985




SO ORDERED

Dated:  _____          _____
         Hon. Katherine Polk Failla
         United States District Judge

Exhibit B

**Non-Discrimination Statement**

**AMBER COURT COMPANIES  DOES NOT DISCRIMINATE AND DOES NOT PERMIT
DISCRIMINATION, AGAINST ANY PERSON ON THE BASIS OF RACE, COLOR, NATIONAL
ORIGIN, RELIGION/CREED, SEX, DISABILITY,  (INCLUDING THE USE OF A POWER
WHEELCHAIR, MANUAL WHEELCHAIR, MOBILITY SCOOTER, ROLLATOR, ROLLING
WALKER, AND WALKER), MARITAL OR PARTNERSHIP STATUS, AGE, SEXUAL
ORIENTATION, GENDER IDENTITY OR EXPRESSION, SOURCE OF INCOME,
IMMIGRATION STATUS, LAWFUL OCCUPATION, STATUS AS A VICTIM OF DOMESTIC
VIOLENCE, MILITATARY STATUS,  HIV STATUS OR BASED ON ASSOCIATION WITH
ANOTHER INDIVIDUAL ON ACCOUNT OF THAT INDIVIDUAL'S ACTUAL OR PERCEIVED
SEXUAL ORIENTATION, GENDER IDENTITY OR EXPRESSION, OR HIV STATUS**

Exhibit C

## Reasonable Accommodation Policy and Request Form

[NAME OF FACILITY] is committed to providing equal housing opportunity. As part of this commitment, we will modify our rules, policies, practices, and services to meet the needs of individuals with disabilities upon request if the accommodation is reasonable and necessary to allow you to fully use and enjoy residing in our community.

It is our policy to reject reasonable accommodation requests only when they are not related to a disability-based need, impose an undue financial and administrative burden, or fundamentally alter the nature of the services we provide. In such cases, we will discuss reasonable alternatives that may meet the requesting individual's needs. We will bear any incidental costs of providing a reasonable accommodation.

## Procedure for Making Request

Requests for reasonable accommodation may be submitted in writing. If you need a reasonable accommodation due to a disability, we encourage you to submit the attached form. The request need not be in writing to be considered by us. Nor must it be made using the attached form to be considered a valid request for a reasonable accommodation.

If you are making a written reasonable accommodation request to us, fully describe the required accommodation on the Reasonable Accommodation Request form.

Please include any additional information that you believe would be useful in assisting us to evaluate the request.

## Verification and Documentation

If your disability or disability-related need is not obvious, we may request that you provide verification that you have a disability-related need for the requested accommodation. If you are an applicant for admission and your disability-related need is documented in your medical evaluation or nursing assessment, we will let you know if we require further documentation.

## Providing Disability-Related Accommodations

We will discuss your request for a reasonable accommodation with you. If the accommodation is approved, we will provide a letter explaining how and when the accommodation can be provided.

If a specific accommodation cannot be made because it is an undue financial and administrative burden or because it would be a fundamental alteration of the services provided by us, then we will discuss alternative accommodations that may address your disability-related needs. If no alternative meets your disability-related needs, or if you and [NAME OF FACILITY] cannot agree on a reasonable alternative, we will notify you of the denial in writing in a reasonable amount of time and will provide an

opportunity for you to make a revised reasonable accommodation request. If your request is part of your application for admission, we will address it in writing as part of our application denial.

**Reasonable Accommodation Request**

Name: _____

Address: _____

_____

Phone: _____

I am requesting a reasonable accommodation on behalf of: _____
(Name of Person with Disability or "Self")

Please describe the reasonable accommodation you are requesting and the disability-related reason for your request:

_____

_____

_____

_____

Date:_____          Signature: _____

This form, along with any additional information, should be submitted to:

If you have any questions, please contact _____ at _____

**<u>For Office Use Only</u>**

[ ]     Approved     Reason: _____

[ ]     Denied              _____

              _____

# Exhibit D

# PART 109--FAIR HOUSING ADVERTISING

Sec.

109.5       Policy.
109.10      Purpose.
109.15      Definitions.
109.16      Scope.
109.20      Use of words, phrases, symbols, and visual aids.
109.25      Selective use of advertising media or content.
109.30      Fair housing policy and practices.


APPENDIX I TO PART 109—FAIR HOUSING ADVERTISING

AUTHORITY:  Title VIII, Civil Rights Act of 1968, 42 U.S.C. 3600-3620; section 7(d), Department of HUD Act, 42 U.S.C. 3535(d).

SOURCE:  54 FR 3308, Jan. 23, 1989, unless otherwise noted.

## § 109.5    Policy.

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.  The provisions of the Fair Housing Act (42 U.S.C. 3600, *et seq.*) make it unlawful to discriminate in the sale, rental, and financing of housing, and in the provision of brokerage and appraisal services, because of race, color, religion, sex, handicap, familial status, or national origin.  Section 804(c) of the Fair Housing Act, 42 U.S.C. 3604(c), as amended, makes it unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement, with respect to the sale or rental of a dwelling, that indicates any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination. However, the prohibitions of the act regarding familial status do not apply with respect to *housing for older persons*, as defined in section 807(b) of the act.

## § 109.10    Purpose.

The purpose of this part is to assist all advertising media, advertising agencies and all other persons who use advertising to make, print, or publish, or cause to be made, printed, or published, advertisements with respect to the sale, rental, or financing of dwellings which are in compliance with the requirements of the Fair Housing Act. These regulations also describe the matters this Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising.

## § 109.15    Definitions.

As used in this part:

(a) *Assistant Secretary* means the Assistant Secretary for Fair Housing and Equal Opportunity.

(b) *General Counsel* means the General Counsel of the Department of Housing and Urban Development.

(c) *Dwelling* means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(d) *Family* includes a single individual.

(e) *Person* includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers, and fiduciaries.

(f) *To rent* includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(g) *Discriminatory housing practice* means an act that is unlawful under section 804, 805, 806, or 818 of the Fair Housing Act.

(h) *Handicap* means, with respect to a person--

(1) A physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) A record of having such an impairment, or

(3) Being regarded as having such an impairment.

This term does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)). For purposes of this part, an individual shall not be considered to have a handicap solely because that individual is a transvestite.

(i) *Familial status* means one or more individuals (who have not attained the age of 18 years) being domiciled with--

(1) A parent or another person having legal custody of such individual or individuals; or

(2) The designee of such parent or other person having such custody, with the written permission of such parent or other person. The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

## § 109.16    Scope.

(a) *General*. This part describes the matters the Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising.  Use of these criteria will be considered by the General Counsel in making determinations as to whether there is reasonable cause, and by the Assistant Secretary in making determinations that there is no reasonable cause, to believe that a discriminatory housing practice has occurred or is about to occur.

(1) *Advertising media*. This part provides criteria for use by advertising media in determining whether to accept and publish advertising regarding sales or rental transactions.  Use of these criteria will be considered by the General Counsel in making determinations as to whether there is reasonable cause, and by the Assistant Secretary in making determinations that there is no reasonable cause, to believe that a discriminatory housing practice has occurred or is about to occur.

(2) *Persons placing advertisements.* A failure by persons placing advertisements to use the criteria contained in this part, when found in connection with the investigation of a complaint alleging the making or use of discriminatory advertisements, will be considered by the General Counsel in making a determination of reasonable cause, and by the Assistant Secretary in making determinations that there is no reasonable cause, to believe that a discriminatory housing practice has occurred or is about to occur.

(b) *Affirmative advertising efforts.* Nothing in this part shall be construed to restrict advertising efforts designed to attract persons to dwellings who would not ordinarily be expected to apply, when such efforts are pursuant to an affirmative marketing program or undertaken to remedy the effects of prior discrimination in connection with the advertising or marketing of dwellings.

[54 FR 308, Jan. 23 1989, as amended at 55 FR 53294, Dec. 28, 1990.]

## § 109.20    Use of words, phrases, symbols, and visual aids.

The following words, phrases, symbols, and forms typify those most often used in residential real estate advertising to convey either overt or tacit discriminatory preferences or limitations.  In considering a complaint under the Fair Housing Act, the Department will normally consider the use of these and comparable words, phrases, symbols, and forms to indicate a possible violation of the act and to establish a need for further proceedings on the complaint, if it is apparent from the context of the usage that discrimination within the meaning of the act is likely to result.

(a) *Words descriptive of dwelling, landlord, and tenants*. White private home, Colored home, Jewish home, Hispanic residence, adult building.

(b) *Words indicative of race, color, religion, sex, handicap, familial status, or national origin--*

(1) *Race*--Negro, Black, Caucasian, Oriental, American Indian.

(2) *Color*--White, Black, Colored.

(3) *Religion*--Protestant, Christian, Catholic, Jew.

(4) *National origin*--Mexican American, Puerto Rican, Philippine, Polish, Hungarian, Irish, Italian, Chicano, African, Hispanic, Chinese, Indian, Latino.

(5) *Sex*--the exclusive use of words in advertisements, including those involving the rental of separate units in a single or multi-family dwelling, stating or tending to imply that the housing being advertised is available to persons of only one sex and not the other, except where the sharing of living areas is involved.  Nothing in this part restricts advertisements of dwellings used exclusively for dormitory facilities by educational institutions.

(6) *Handicap*--crippled, blind, deaf, mentally ill, retarded, impaired, handicapped, physically fit. Nothing in this part restricts the inclusion of information about the availability of accessible housing in advertising of dwellings.

(7) *Familial status*--adults, children, singles, mature persons.  Nothing in this part restricts advertisements of dwellings which are intended and operated for occupancy by older persons and which constitute *housing for older persons* as defined in Part 100 of this title.

(8) *Catch words*--Words and phrases used in a discriminatory context should be avoided, e.g., *restricted, exclusive, private, integrated, traditional, board approval or membership approval.*

(c) *Symbols or logotypes.* Symbols or logotypes which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(d) *Colloquialisms.* Words or phrases used regionally or locally which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(e) *Directions to real estate for sale or rent (use of maps or written instructions).* Directions can imply a discriminatory preference, limitation, or exclusion.  For example, references to real estate location made in terms of racial or national origin significant landmarks, such as an existing black development (signal to blacks) or an existing development known for its exclusion of minorities (signal to whites).  Specific directions which make reference to a racial or national origin significant area may indicate a preference.  References to a synagogue, congregation or parish may also indicate a religious preference.

(f) *Area (location) description.* Names of facilities which cater to a particular racial, national origin or religious group, such as country club or private school designations, or names of facilities which are used exclusively by one sex may indicate a preference.

## § 109.25   Selective use of advertising media or content.

The selective use of advertising media or content when particular combinations thereof are used exclusively with respect to various housing developments or sites can lead to discriminatory

results and may indicate a violation of the Fair Housing Act. For example, the use of English language media alone or the exclusive use of media catering to the majority population in an area, when, in such area, there are also available non-English language or other minority media, may have discriminatory impact. Similarly, the selective use of human models in advertisements may have discriminatory impact. The following are examples of the selective use of advertisements which may be discriminatory:

(a) *Selective geographic advertisements.* Such selective use may involve the strategic placement of billboards; brochure advertisements distributed within a limited geographic area by hand or in the mail; advertising in particular geographic coverage editions of major metropolitan newspapers or in newspapers of limited circulation which are mainly advertising vehicles for reaching a particular segment of the community; or displays or announcements available only in selected sales offices.

(b) *Selective use of equal opportunity slogan or logo.* When placing advertisements, such selective use may involve placing the equal housing opportunity slogan or logo in advertising reaching some geographic areas, but not others, or with respect to some properties but not others.

(c) *Selective use of human models when conducting an advertising campaign.* Selective advertising may involve an advertising campaign using human models primarily in media that cater to one racial or national origin segment of the population without a complementary advertising campaign that is directed at other groups. Another example may involve use of racially mixed models by a developer to advertise one development and not others. Similar care must be exercised in advertising in publications or other media directed at one particular sex, or at persons without children. Such selective advertising may involve the use of human models of members of only one sex, or of adults only, in displays, photographs or drawings to indicate preferences for one sex or the other, or for adults to the exclusion of children.

## § 109.30 Fair housing policy and practices.

In the investigation of complaints, the Assistant Secretary will consider the implementation of fair housing policies and practices provided in this section as evidence of compliance with the prohibitions against discrimination in advertising under the Fair Housing Act.

(a) *Use of Equal Housing Opportunity logotype, statement, or slogan.* All advertising of residential real estate for sale, rent, or financing should contain an equal housing opportunity logotype, statement, or slogan as a means of educating the homeseeking public that the property is available to all persons regardless of race, color, religion, sex, handicap, familial status, or national origin. The choice of logotype, statement or slogan will depend on the type of media used (visual or auditory) and, in space advertising, on the size of the advertisement. Table I (see Appendix I) indicates suggested use of the logotype, statement, or slogan and size of logotype. Table II (see Appendix I) contains copies of the suggested Equal Housing Opportunity logotype, statement and slogan.

(b) *Use of human models.* Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex,

handicap, familial status, or national origin. If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with children. Models, if used, should portray persons in an equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status, or national origin, and is not for the exclusive use of one such group.

(c) *Coverage of local laws*. Where the Equal Housing Opportunity statement is used, the advertisement may also include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

(d) *Notification of fair housing policy*--

(1) *Employees*. All publishers of advertisements, advertising agencies, and firms engaged in the sale, rental or financing of real estate should provide a printed copy of their nondiscrimination policy to each employee and officer.

(2) *Clients*. All publishers or advertisements and advertising agencies should post a copy of their nondiscrimination policy in a conspicuous location wherever persons place advertising and should have copies available for all firms and persons using their advertising services.

(3) *Publishers' notice*. All publishers should publish at the beginning of the real estate advertising section a notice such as that appearing in Table III (see Appendix I). The notice may include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

APPENDIX I TO PART 109--FAIR HOUSING ADVERTISING

The following three tables may serve as a guide for the use of the Equal Housing Opportunity logotype, statement, slogan, and publisher's notice for advertising:

Table I

A simple formula can guide the real estate advertiser in using the Equal Housing Opportunity logotype, statement, or slogan.

In all space advertising (advertising in regularly printed media such as newspapers or magazines) the following standards should be used:

| Size of advertisement | *Size of logotype in inches* |
|---|---|
| ½ page or larger………………………….. | 2x2 |
| 1/8 page up to ½ page………………………… | 1x1 |
| 4 column inches to 1/8 page…........................ | ½ x ½ |

| Less than 4 column inches | ( [1] ) |
|---|---|

[1] Do not use.

In any other advertisements, if other logotypes are used in the advertisement, then the Equal Housing Opportunity logo should be of a size at least equal to the largest of the other logotypes; if no other logotypes are used, then the type should be bold display face which is clearly visible. Alternatively, when no other logotypes are used, 3 to 5 percent of an advertisement may be devoted to a statement of the equal housing opportunity policy.

In space advertising which is less than 4 column inches (one column 4 inches long or two columns 2 inches long) of a page in size, the Equal Housing Opportunity slogan should be used. Such advertisements may be grouped with other advertisements under a caption which states that the housing is available to all without regard to race, color, religion, sex, handicap, familial status, or national origin.

Table II

Illustrations of Logotype, Statement, and Slogan.  Equal Housing Opportunity Logotype:



Equal Housing Opportunity Statement:  We are pledged to the letter and spirit of U.S. policy for the achievement of equal housing opportunity throughout the Nation.  We encourage and support an affirmative advertising and marketing program in which there are no barriers to obtaining housing because of race, color, religion, sex, handicap, familial status, or national origin.

Equal Housing Opportunity Slogan:  "Equal Housing Opportunity."

Table III

Illustration of Media Notice--Publisher's notice:  All real estate advertised herein is subject to the Federal Fair Housing Act, which makes it illegal to advertise "any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or intention to make any such preference, limitation, or discrimination."

We will not knowingly accept any advertising for real estate which is in violation of the law. All persons are hereby informed that all dwellings advertised are available on an equal opportunity basis.

# Exhibit E

# Fair Housing

## Accessible Housing for Everyone





Office of the New York State Attorney General

*Letitia James*

---

## Resources

### Office Of the New York State Attorney General, Civil Rights Bureau

28 Liberty Street
New York, NY 10005
(212) 416-8250
(800) 788-9898 (TDD)
ag.ny.gov

### New York State Division of Human Rights

One Fordham Plaza, 4th Floor
Bronx, NY 10458
888-392-3644
(718) 741-8300 (TDD/TTY)
dhr.ny.gov

### U.S. Department of Housing and Urban Development, Fair Housing Enforement Center

26 Federal Plaza, Room 3541
New York, NY 10278-0068
(212) 264-8000
(212) 264-0927 (TTY)
hud.gov

### New York City Human Rights Commission

22 Reade Street, First Floor
New York, NY 10007
(212) 306-7450
nyc.gov/humanrights

---

### Dear New Yorkers,

Whether you live in a city, suburb or rural community; finding safe, affordable housing can be a challenge. Fortunately, our laws protect your right to choose where to live without discrimination based on race, religion, sex or a number of other characteristics.

Federal and New York State laws exist to ensure that equal housing opportunities are available to all. Some local governments offer even more protections. This brochure explains some of those laws and includes information about what to do if you believe a landlord, seller or lender has discriminated against you. Housing is one of life's essentials; it is important that everyone has access to it, free from discrimination. If you have any questions or concerns, please contact my office.

Sincerely,

*Letitia James*



Attorney General of New York
*Letitia James*

## Fair Housing Laws:

### How We Are Protected

The federal Fair Housing Act, the New York State Human Rights Law, and various local laws, prohibit discrimination by housing providers (including owners, real estate agents, managing agents, building superintendents, cooperative and condominium boards), and lenders (banks and mortgage companies).

- The Federal Fair Housing Act makes it illegal to discriminate on the basis of a person's race, color, national origin, religion, disability (physical or mental), or sex.

- The NYS Human Rights Law covers all the same characteristics, but also protects against discrimination based on creed, age, sexual orientation, gender identity or expression, marital status, military status, or lawful source of income (public or housing assistance, social security, supplemental security income, pension, child support, alimony, foster care subsidies, annuities or unemployment benefits).

Many local governments, have additional protections The New York City Human Rights Law also covers: gender, citizenship status, partnership status, or lawful occupation.

### Most Housing Is Included

In New York State, anti-discrimination laws cover most types of housing, with four main exceptions:

- One- or two-family owner-occupied buildings;

- Room rentals in housing for individuals of the same sex, such as college dormitories or boarding houses where all residents are of the same sex;

- Housing intended for people over the age of 55, or over the age of 62; and

- Room rentals in owner-occupied housing.

## Prohibited Actions

These laws apply to the sale or rental of housing and also to mortgage lending and provide protections against different forms of housing discrimination including the following:

- Refusing to rent, sell, finance, insure or negotiate for housing;

- Making housing unavailable;

- Setting different terms or conditions, or providing unequal services;

- Printing or circulating a discriminatory advertisement;

- Refusing to make or provide information for a loan, or imposing different terms or conditions; or

- Harassing, threatening, intimidating, or coercing anyone, including sexual harassment.

## Persons Living with a Disability Are Protected

Under the fair housing laws, a landlord may not:

- Refuse to make reasonable modifications to a dwelling or common use area to accommodate a person's disability;

- Refuse to make reasonable accommodations in policies or services if necessary for the person living with a disability to use the housing; or

- In addition, any multifamily housing built after 1991 must comply with accessibility requirements

## Repairing the Damage

If it is found that discrimination has taken place, steps may be taken to remedy the situation.

These can include:

- Requiring changes in policies and practices;

- Making the housing or loan available;

- Assessing money damages and/or attorney fees; or imposing civil fines and penalties.

## Filing a Complaint

If you have questions or believe you have been a victim of housing discrimination, the following agencies may be able to help. You can find contact information for each on the back of this brochure.

- The New York State Attorney General's Civil Rights Bureau investigates and prosecutes discriminatory policies, and patterns or practices of discrimination. The Bureau is committed to combating housing discrimination throughout the State of New York.

- The New York State Division of Human Rights handles individual complaints of discrimination. You have one year after an alleged violation to file a complaint.

- The U.S. Department of Housing and Urban Development (HUD) handles individual complaints of discrimination based on the federal Fair Housing Act. You have one year after an alleged violation to file a complaint.

- The New York City Commission on Human Rights (CCHR) handles individual complaints of discrimination based on the New York City Human Rights Law.

- You have one year after an alleged violation to file a complaint. You are precluded from filing a claim with CCHR if you have already filed the same claim based on the same facts with another agency or in court.

Exhibit F

**APPROVED TRAINERS**

| | |
|---|---|
| Scott P. Moore | Baird Holm LLP |
| Andrew Darcy | Seton Hall Law |

Exhibit G

Dear _____:

We write to clarify the admission policies for [NAME OF FACILITY]:

As you know, our facility offers [PROGRAM] services to residents who are medically stable but need long-term residential care, room, board, housekeeping, personal care, supervision, and home health services.

We write to clarify that our facility does not discriminate against people who use wheelchairs. We consider all prospective residents based upon our ability to meet their individual needs, including those who may use a wheelchair and those that may need reasonable accommodations.

We value your referral of prospective residents and look forward to continuing to work with you.

Sincerely,


[NAME OF ADMINISTRATOR]

Exhibit H

[NAME OF FACILITY] Application Tracking

| GENERAL REFERRAL INFORMATION | | | | | DISCLOSURE OF MOBILITY IMPAIRMENT | | ASSESSMENTS | | | | DENIALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of Potential Applicant | Date of Initial Inquiry | Referral Source | Referral Source Contact Name | Referral Source Contact Information | Was mobility impairment disclosed prior to assessment? (Yes/No) | If yes, describe how it was disclosed and identify the person who made such disclosure | Has potential applicant been assessed? (Yes/No) | If "No", why was the individual not assessed? | If Yes, did the assessment indicate the applicant has a mobility impairment? | If the assessment indicated mobility impairment, type of mobility impairment | Was applicant's application denied? (Yes/No) | If Yes, what is the reason for denial (insert corresponding number from the Notice of Admission Determination form) |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Exhibit I

# [NAME OF FACILITY]
## Notice of Admission Determination

Applicant's Name:

_____

Address:

_____

Family member/guardian:

_____

Address:

_____

Thank you for your interest in [NAME OF FACILITY]. Unfortunately, after reviewing your application information, we have determined that we cannot admit you to the facility. Below is an explanation of our decision. If our decision is based on bed availability, you may choose to join a wait list for admission. If you would like to join our waitlist, please check the box below and return this form to [NAME OF FACILITY, ADDRESS].

☐ **Please add me to the [NAME OF FACILITY] Waitlist.**

Our denial decision is based on the following information from your application or assessment:

_____

_____

_____

_____

If you have a mobility disability and that mobility disability was related to our decision, we considered the following reasonable accommodations:

_____

_____

_____

But     ____ You rejected the offered accommodation.

         ____ We determined that the accommodation was not reasonable because

         _____,
         and that no other accommodation was reasonable and would meet your needs.

# [NAME OF FACILITY]
## Notice of Admission Determination

Your application was denied because:

1. _____ You require continual medical or nursing care.

2. _____ You have a serious and persistent mental disability sufficient to warrant placement in an acute care or residential treatment facility operated or certified by an office of the Department of Mental Hygiene.

3. _____ You require health, mental health or other services which cannot be provided by local service agencies.

4. _____ You cause or are likely to cause a danger to yourself or others.

5. ___ You have repeatedly behaved in a manner which directly impairs the well-being, care, or safety of the resident or other residents or which directly interferes with the orderly operation of the facility.

6. ___ You require continual skilled observation of symptoms and reactions, or accurate recording of such skilled observations for the purposes of reporting on a medical condition to your physician.

7. ___ You refuse or are unable to comply with a prescribed treatment program, including but not limited to a prescribed medications regimen and such refusal or inability causes, or is likely to cause, in the judgment of your physician, life-threatening danger to yourself or others.

8. ___ You are chronically bedfast and require lifting equipment to transfer or the assistance of 2 persons to transfer.

9. ___ You have chronic unmanaged urinary or bowel incontinence.

10. ___ You suffer from a communicable disease or health condition which constitutes a danger to other residents and staff.

11. ___ You are dependent on medical equipment and do not meet all conditions set in 18 NYCRR 487.4(c)(11)(i) through (vi) (adult home regulations).

12. ___ You engage in alcohol or drug use which results in aggressive or destructive behavior.

**If the facility has an Assisted Living Program:**

13. ___ You do not exhibit a stable medical condition as categorized by the long-term care patient classification system as defined in Title 10 NYCRR.

14. ___ You are unable, with direction, to take action sufficient to assure self-preservation in an emergency.

### [NAME OF FACILITY]
### Notice of Admission Determination

15. ___ You are cognitively, physically or medically impaired to a degree which endangers the safety of yourself or other residents.

16. ___ The facility cannot support your physical, supervisory and psycho-social needs.

17. ___ The facility cannot safely and adequately care for you, even if the services identified as necessary by the assessment of your needs are provided.

18. ___ Other: Specify:_____

Completed by: _____     Date:

Exhibit J

**[NAME OF FACILITY]**
**Termination Log Form**

Completed by: _____ Date: _____

Name of Resident: _____ Age/DOB: _____

Mobility device used: ☐ Cane ☐ Walker/Rollator ☐ Manual Wheelchair ☐ Power Wheelchair

Date of termination of admission agreement: _____

Termination is: ☐ Voluntary ☐ Involuntary

Notice of Termination provided to resident: ☐ Yes ☐ No

Reason for Termination: _____

_____

_____

Date of most recent UAS: _____

Discharged to: ☐ Nursing Home ☐ Hospital ☐ Living with Family ☐ Other: _____